GIBSON, DUNN & CRUTCHER LLP
Wayne Barsky, SBN 116731
  wbarsky@gibsondunn.com
Jason Lo, SBN 219030
  jlo@gibsondunn.com
Ellen Lin, SBN 251045
  elin@gibsondunn.com
Jordan H. Bekier, SBN 273185
  jbekier@gibsondunn.com
Cassandra L. Gaedt, SBN 280969
  cgaedt@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Attorneys for Defendant Zynga

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Gametek LLC, | Case No. C 13-02546 RS DR |
| Plaintiff, | **DEFENDANT ZYNGA'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| ZYNGA INC., | Hearing Date: April 17, 2014 |
| Defendant. | Hearing Time: 1:30 pm |
| | Courtroom: 3, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA |
| | Name of Judge: Hon. Richard Seeborg |

Gibson, Dunn &
Crutcher LLP

## <u>NOTICE OF MOTION AND MOTION</u>

PLEASE TAKE NOTICE that on April 17, 2014 at 1:30 pm in the courtroom of the Honorable Richard Seeborg at Courtroom 3, 17th Floor, U.S. Courthouse, 450 Golden Gate Avenue, San Francisco, CA, Defendant Zynga will and does hereby move the Court for an order dismissing with prejudice all claims brought against it by Plaintiff Gametek in its Amended Complaint For Infringement Of U.S. Patent No. 7,076,445 (D.I. 15).

This motion is made pursuant to Federal Rule of Civil Procedure 12(c) on the ground that, based on the pleadings, Zynga is entitled to judgment as a matter of law. Gametek's patent infringement assertions fail because the sole asserted patent is invalid under 35 U.S.C. §101 as a matter of law for lack of patentable subject matter. This motion is based on this Notice of Motion and Motion to Dismiss, the attached Memorandum of Points and Authorities, and the pleadings on file in this action. A proposed order is included.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................... 1

II.   STATEMENT OF THE ISSUE TO BE DECIDED .................................................... 2

III.  THE '445 PATENT ...................................................................................................... 2

IV.   ARGUMENT: The '445 patent claims an abstract idea and nothing more .............................. 5

  A.    Abstract ideas are not patentable.................................................................................. 5

  B.    The '445 claims are directed to an abstract idea: the basic gaming concept of
        allowing a user to purchase an object for use in a game ................................................ 7

  C.    The preamble and recited steps provide no meaningful limitation to the abstract
        idea ........................................................................................................................... 9

        1.    Preamble: performing abstract idea on general purpose computer is
              insufficient .......................................................................................................... 9

        2.    Claimed steps: reciting conventional, obvious pre-solution activity is
              insufficient ....................................................................................................... 12

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Accenture Global Services, GMBH v. Guidewire Software, Inc.*,
   728 F.3d 1336 (Fed. Cir. Sep. 5, 2013) ................................................................. 6, 10

*Association for Molecular Pathology v. Myriad Genetics*,
   133 S.Ct. 2107 (2013)............................................................................................... 6

*Bancorp Services LLC v. Sun Life Assurance Co. of Canada*,
   687 F.3d 1266 (Fed. Cir. 2012) ............................................... 8, 9, 10, 13, 14, 15

*Bilski v. Kappos*,
   130 S.Ct. 3218 (2010).............................................................. 5, 6, 7, 12, 15, 16

*Cardpool, Inc. v. Plastic Jungle, Inc.*,
   No. 12-4182, 2013 WL 245026 (N.D. Cal. Jan. 22, 2013)...................................... 10

*CLS Bank Int'l v. Alice Corp.*,
   717 F.3d 1269 (Fed. Cir. 2013) .......................................... 1, 9, 11, 13, 15, 16

*Compression Technology Solutions LLC v. EMC Corporation*,
   No. 12-1746, 2013 WL 2368039 (N.D. Cal. May 29, 2013) ........................ 7, 9, 10, 14

*Cybersource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ............................................. 8, 9, 12, 13, 14, 15

*Dealertrack, Inc. v. Huber*,
   674 F.3d 1315 (Fed. Cir. 2012) ............................................... 8, 10, 11, 13, 15

*Fort Properties, Inc. v. American Master Lease LLC*,
   671 F.3d 1317 (Fed. Cir. 2012) ............................................... 8, 9, 12, 15, 16

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
   132 S.Ct. 1289 (2012)........................................ 1, 2, 5, 6, 7, 10, 11, 12

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
   No. 12-1233, 2012 WL 3985118 (N.D. Cal. Sep. 11, 2012)........................ 6, 10, 15

*Ultramercial, Inc. v. Hulu LLC*,
   722 F.3d 1335 (Fed. Cir. 2013) ......................................................................... 3

Gibson, Dunn & Crutcher LLP

## I.  INTRODUCTION

This case should be dismissed, because the sole patent asserted by Plaintiff Gametek claims an abstract idea.  The patent statute, 35 U.S.C. §101, does not permit claims on abstract ideas.

The asserted patent, U.S. Patent No. 7,076,445 ("the '455 patent"), claims the abstract idea of allowing players to purchase additional objects during a game.  This concept is nearly as old and as basic as the advent of money itself — it's "a basic building block of human ingenuity."  *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (cert granted).  For example, the idea of incorporating money during game play has been around in carnival games since at least the 14th century, board games since at least the 1890's, and gambling since at least 5000 BC.[1]  Game providers long have realized that they can make money while the game is being played, not just through the initial purchase of the game, and thus allowed players to purchase objects during the game.  To satisfy §101, the claims must do something "significantly more" than simply describe the abstract idea: there must be an "inventive concept" to ensure the patent in practice amounts to significantly more than an abstract idea.  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1294, 1297 (2012).  Here, the claims fail to provide anything more than the abstract idea itself.

Under Plaintiff's construction, the method claimed in the '445 patent covers common and obvious steps for making purchases during a game, such as establishing an account, displaying a price, offering the item, and supplying the item after purchase.  Supreme Court case law is clear that adding steps that must be taken in order to apply the abstract idea (or conventional activity previously engaged in by those in the field) cannot make that idea patentable.

All of the elements in the claimed method can be performed manually, essentially with pen and paper, in the real world.  Only the preamble of the claims contains a reference to a general

---

[1] *See, e.g.*, Joe McKennon, *A Pictorial History of the American Carnival* 12 (1979); Koichi Masukawa, *A Short History of Backgammon in Japan*, Board Games Studies 140, 140 (2000); Bruce Whitehill, *American Games: A Historical Perspective*, Board Games Studies 116, 131-32 (1999); Jaya Saxena, *19th Century Games: Let's Play Department Store!* New York History (Feb. 25, 2013); David G. Schwartz, *The History of Gambling: Roll The Bones* 377-78 (2006).

Gibson, Dunn & Crutcher LLP

Def. Zynga's Mot. for J. on the Pleadings     Case No. C 13-02546 RS

purpose computer: "*using a programmed computer to effect the following steps.*"[2]  But, recent cases from the Federal Circuit and this District make clear that this bare reference to a general purpose computer, with no details as to specific hardware or software, is insufficient to render patentable an abstract idea.

By taking an age-old idea and using broad language to describe it in a rudimentary fashion (essentially, "perform the method somehow using a computer"), the '445 patent improperly claims ownership over both known <u>and unknown future</u> innovations.  Tying up future uses and inhibiting new discoveries is the exact problem that the prohibition on abstract ideas is intended to avoid. Abstract ideas are "basic tools of scientific and technological work" and "free to all men and reserved exclusively to none."  *Prometheus*, 132 S.Ct. at 1293.  Therefore, the crux of this litigation is Gametek's improper attempt to reserve this abstract idea exclusively for itself.

## II.     STATEMENT OF THE ISSUE TO BE DECIDED

Pursuant to Civil L.R. 7-4, the issue to be decided is whether the asserted claims of U.S. Patent No. 7,076,445 are invalid under 35 U.S.C. §101 for failure to recite patentable subject matter.

## III.    THE '445 PATENT

The '445 patent's specification describes the "present invention" as relating "generally to the creation, integration, and transaction of advantages."  (col.1 ll.17-18)  The specification also states that the "present invention" can be implemented with or without a computer: "The present invention is directed to providing systems and methods used to create, integrate, and transact various advantages in **non-computing**, partial computing, and interactive computing environments."  (col.2 ll.50-53) (emphasis added). The examples of environments described in the patent to use the invention reach across a wide range of industries: "regular board games, sports, gambling, sales, services and queuing, employment (e.g. promotions, hiring, etc.), issuing permits, and securities and finance" in addition to computer games.  (col.4 ll.60-65)  The purported invention itself similarly spans a broad swath of life activities: purchasing a preferred seat on an airplane, train, or bus (col.2 ll.11-12, col.8 ll.46-52, Figure 3), additional strokes in a golf match (col.5 l.63 to col.6 l.3), a higher

---

[2]  Claim language is italicized throughout to distinguish from Court language in cited case opinions.

Gibson, Dunn & Crutcher LLP

speeding limit (col.5 ll.40-49, col.10 ll.37-52, Figure 6), and better ad placement (col.10 ll.55-67), in addition to computer game examples.

The asserted claims of the '445 patent are directed toward a gaming environment.[3]  Unpacking the language of the claims, they merely take an age-old gaming concept of allowing players to purchase objects during a game — and describe it in the modern world of video games in a rudimentary fashion.  The first part of each asserted independent claim, the preamble, makes a generic reference to a general purpose computer.  The second part of each claim, the actual steps of the method, recites an aspect of playing games used for centuries and makes no further reference to a computer.  Specifically, the steps, though lengthy, recite nothing more than a basic purchasing transaction.  The initial steps set the stage to perform the purchase: (a) track the activity of the user, (b) create an account for the user, (c) determine whether the user has money, and (d) communicate the object's price.  Then the purchasing steps break down the process into their components in a fundamental way: (e) offer the object, (f) allow the user to purchase the object, and (g) supply the object.

Representative claim 1 reads:

1. A method of managing the operation of a game which includes a game environment, and is programmed to control a gaming action for at least one of a plurality of users, said managing method using a programmed computer to effect the following steps:
a) tracking the activity of the at least one user in the course of the gaming action;
b) permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics;
c) determining the eligibility of the at least one user to purchase at least one of a plurality of game objects, said eligibility determining comprises the following sub steps:
    i) permitting the at least one user to select the at least one game object,
    ii) setting the purchase price of the at least one game object, and
    iii) comparing the account balance of the at least one user's consideration with the set price of the at least one game object and, determining if the balance of the user's

---

[3]  The Federal Circuit recently advised to adopt the patentee's proffered construction when faced with a §101 motion before formal claim construction.  *See Ultramercial, Inc. v. Hulu LLC*, 722 F.3d 1335, 1339-40 (Fed. Cir. 2013) (cert pending).  Here, plaintiff Gametek only seeks construction of the terms "the at least one user having a set of demographics," "at least one user has made a commitment of consideration," "purchase" and "consideration."  *See* Joint Claim Construction Statement (D.I. 66, Feb. 7, 2014).  This motion uses those constructions proffered by Gametek.  The breadth of Gametek's constructions, as compared to Zynga's constructions, further support the abstractness of the patent claims.

Gibson, Dunn &
Crutcher LLP

consideration is not less than the set price, determining the at least one user to be eligible to purchase the at least one game object;

d) displaying in the game environment a purchase price of the at least one game object;

e) presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the at least one gaming action of the at least one user and, the one game environment or the one set of demographics of the least one user

f) permitting the at least one user to purchase the at least one game object at the set purchase price without interrupting the gaming action of the at least one user; and

g) supplying the at least one purchased game object to the at least one user without interrupting the gaming action of the at least one user and incorporating the game object into the game.

As the specification indicates, the steps (a-g) of the claimed method can be practiced without any computer implementation. The real world example in the specification of purchasing additional golf strokes during a match (col.5 l.63 to col.6 l.3) illustrates that no computer implementation is necessary to practice the abstract and timeworn gaming concepts of the claim.

In charity golf tournaments, organizations will raise money by selling mulligans to golfers during the game. A mulligan is an additional shot, allowing a golfer to re-play from the spot of the previous stroke without penalty, as if the first stroke had never happened. Mulligans can be sold after the start of the game as "emergencies" at various holes. According to the U.S. Golf Association, this "do-over" has been in practice since at least the 1920's.

All the claim elements, using Gametek's proffered constructions, are met in this scenario. The game tracks the activity of players (step a) because a charity representative and players will monitor the golf teams and their individual strokes, scores, and payments. Players create an account (step b) by registering for the tournament and a golf team. The golf representative determines the eligibility of each player to purchase game objects (step c) by comparing whether the player's cash is more than the price of the mulligan he wants to buy. For example, determining that a player with $20 can buy a $3 mulligan because 20 is more than 3. The game displays the purchase price of a game object (step d) by a flyer stating mulligans cost $3 each.

The game presents an offer to purchase a game object (step e) by the charity representative asking the golfer, after a poor stroke, whether he wants to purchase a mulligan. The game permits the player to purchase a game object (step f) by the player providing $3 cash to the charity representative. The game supplies the purchased game object (step g) by the charity representative allowing the

golfer to re-play from the same location and not counting the first stroke against the golfer's total score.

Similarly, users of board games have long utilized such in-game "transactions" to purchase objects for use within the game. From the nineteenth century, board game rules have permitted users to trade in-game currency for advantages or offers such as insurance, an extra turn, or objects that give the user opportunities to earn even more in-game currency. In those games, either one player or all of the players collectively act as the "bank," to ensure that such transactions occur at the appropriate times during the game, and to ensure that players pay the appropriate price for each item.

The only difference between these examples and the '445 claims is that the claims recite a general purpose computer in the preamble. But, the claims provide no details on the computer, or how the method is to be implemented on the computer. Any computer from a chain electronics store would suffice.

Like the claims, the specification provides little information on the computer recited in the claims. The patent requires only a basic computer, as shown in Figure 1. It has generic units for display, processing, and storage; in other words, only the necessary components to make a computer work. (col.6 ll.57-64) The conclusion summarizes the same, (col.11 ll.18-23), stating the device "is readable by a general or special purpose programmable computer," (col.11 ll.32-38).

## IV. ARGUMENT: The '445 patent claims an abstract idea and nothing more

### A. Abstract ideas are not patentable

No one can patent an "abstract idea." Abstract ideas — like laws of nature and natural phenomena, the two other prohibited subject matters — are "basic tools of scientific and technological work" and "free to all men and reserved exclusively to none." *Prometheus*, 132 S.Ct. at 1293. Monopolization of those tools through the grant of a patent impedes innovation rather than promotes it. *Id.*

The statutory §101 inquiry is a question of law and a "threshold test." *Bilski v. Kappos*, 130 S.Ct. 3218, 3225 (2010). The Supreme Court recently rejected the argument that §101 is a "dead letter." *Prometheus*, 132 S.Ct. at 1303-04. To the contrary, the Court held that the §101 inquiry should be applied more rigorously and performs a meaningful "screening function." *Id.* Applying

Gibson, Dunn &
Crutcher LLP

these principles, the Court has invalidated all or some claims in every one of its recent §101 decisions.  *See Association for Molecular Pathology v. Myriad Genetics*, 133 S.Ct. 2107, 2111 (2013); *Prometheus*, 132 S.Ct. at 1305; *Bilski*, 130 S.Ct. at 3231.[4]

In determining whether a patent purports to claim an abstract idea, the Supreme Court applies a two-part analysis.  First, identify the abstract idea.  Second, ask "What else is there in the claims before us?"  *Prometheus*, 132 S.Ct. at 1297.  *See also Accenture Global Services, GMBH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1341 (Fed. Cir. Sep. 5, 2013) (reciting the Supreme Court's two-step analysis).  To be patent eligible, the claims must do "significantly more" than simply describe that abstract idea.  *Prometheus*, 132 S.Ct. at 1294, 1297.  There must be an "inventive concept" to ensure the patent in practice amounts to <u>significantly more</u> than an abstract idea.  *Id.* at 1294.

If the additional steps consist only of "well-understood, routine, conventional activity already engaged in by the scientific community," then the steps when viewed as a whole "add nothing significant beyond the sum of their parts taken separately" and therefore are not patentable.  *Id.* at 1298.  Essentially, a patent cannot restate an abstract idea and tell the public to "apply it" in some rudimentary fashion.  *Id*. at 1294.

The underlying concern is that claims cannot be so sweeping as to cover both known <u>and unknown</u> uses, thus preempting the idea's use.  *Id.* at 1301.  By covering a broad range of potential uses, such patents tie up future uses and inhibit new discoveries.  *Id*.  A patent need not preempt an entire field; instead, the question is whether the patent "would risk <u>disproportionately</u> tying up" use of the abstract idea.  *Id.* at 1294, 1303.  *See also OIP Technologies, Inc. v. Amazon.com, Inc.*, No. 12-1233, 2012 WL 3985118, at *20 (N.D. Cal. Sep. 11, 2012) ("The central question remains whether the patentee seeks broad monopoly rights over a basic concept, fundamental principle, or natural law without a <u>concomitant contribution</u> to the existing body of scientific and technological knowledge.");

---

[4]  The Supreme Court has in recent years strengthened the §101 inquiry.  This is in contrast to the 2005 timeframe, when the PTO examiner made a §101 objection during the '445 prosecution.  That objection concerned whether the claimed module was software.  Instead, this motion, and the Supreme Court's recent precedent tightening the §101 inquiry, requires scrutiny as to whether the patent attempts to claim an abstract idea, a question the examiner never confronted.

Gibson, Dunn & Crutcher LLP

*Compression Technology Solutions LLC v. EMC Corporation*, No. 12-1746, 2013 WL 2368039, at *8 (N.D. Cal. May 29, 2013) (holding that the claims would broadly cover almost all applications and thus preempt unknown future use even though the information processing method was "limited to digital data and context insensitive parsing").

While Courts have not articulated an absolute definition of an "abstract idea," the Supreme Court has emphasized these guideposts: (1) implementing an abstract idea on a general purpose computer does not make the idea patentable, *Prometheus*, 132 S.Ct. at 1301, (2) claims are abstract when they use language so sweeping as to cover both known and unknown uses of that idea, preempting the idea's use, *id.*, (3) limiting an abstract idea to one technological environment does not make the concept patentable, *id.* at 1297, 1301, and (4) adding conventional pre-solution activity does not make the concept patentable, *id.* at 1298, 1301.

**B.     The '445 claims are directed to an abstract idea: the basic gaming concept of allowing a user to purchase an object for use in a game**

Following the Supreme Court's mandate in *Prometheus*, the first step is to identify the abstract idea.  Here, the '445 claims recite the abstract idea in the last two steps (f) and (g): allowing a user to purchase an object for use in a game without interruption.

This concept has been ubiquitous in games for many years.  In carnival games such as Skeeball or ring toss or target shooting, players can purchase additional balls or throws or shots.  In board games, players can use money in order to purchase items in the game, avoid obstacles, or get ahead in the game.

The method claimed in the '445 patent is similar to method claims the Supreme Court and Federal Circuit recently held invalid for claiming abstract ideas.  For example, in *Bilski*, the Supreme Court unanimously invalidated a method for managing the purchasing of products.  Specifically, the Court held to be an abstract idea the method of managing the purchasing of commodities in the field of energy markets by allowing buyers to purchase commodities at a fixed rate and then other buyers to purchase commodities at a different fixed rate that balances the risk of the first purchases.  130 S.Ct. at 3223-24.  The Court explained that the patentee was trying to patent the basic concept of hedging, though limited to the energy market.  *Id.* at 3231.  By not adding anything "significantly

Gibson, Dunn & Crutcher LLP

more" (no "inventive concept") to the abstract idea other than identifying a field of use and instructing how to perform the idea using well-known techniques, the patent's preemption of the abstract idea, even in one field, would effectively grant a monopoly contrary to §101. *Id.* Here, the '445 patent does the same. The preamble identifies computer games as a field of use, and the claimed steps instruct how to perform the idea using well-known techniques such as determining whether the user has money.

Similarly, the Federal Circuit repeatedly has invalidated claims as too abstract where they recite a basic concept in their respective fields:

- a computerized method of managing an insurance policy in the field of life insurance by generating a policy with a stable value protected investment, calculating fee units and investment credits, determining an investment value for the current day, calculating a policy value for the current day, and removing or accumulating fee units based thereon — the abstract idea of a stable value protected life insurance policy (*Bancorp Servs. LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1270-71, 1278 (Fed. Cir. 2012));

- a computerized method of managing loan applications in the field of car loans by receiving applications, selectively forwarding the data to funding sources, then forwarding the reply data to the original sources — the abstract idea of processing car loan applications through a clearinghouse (*Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012));

- a computerized method of managing tax-deferred purchases in a real estate portfolio by aggregating real property to form a portfolio, dividing the interests by selling to buyers, and re-aggregating at a specified time interval — the abstract idea of investing in real estate without incurring tax liability (*Fort Properties, Inc. v. American Master Lease LLC*, 671 F.3d 1317, 1322 (Fed. Cir. 2012));

- a computerized method of verifying a credit card purchase over the Internet by obtaining data from the Internet on other transactions using an Internet address, constructing a map of those numbers, and using the map to determine if the purchase is valid — the abstract idea of a fraud detection system for credit card purchases over the Internet (*Cybersource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011));

- a computerized method of managing financial transactions to settle obligations by creating a credit record and debit record in independent institutions, adjusting the records based on daily balances, and exchanging credits and debits based on the adjustments — the abstract idea of using escrow to reduce settlement risk (*CLS Bank*, 717 F.3d at 1285-86).

### C.     The preamble and recited steps provide no meaningful limitation to the abstract idea

Neither the preamble nor the steps recited in the claim provides any meaningful limitation to the abstract idea recited in the '445 claims.

The claimed steps, when viewed as a whole, recite a method that "can be performed manually, or [is] the equivalent of human mental work." *Cybersource*, 654 F.3d at 1371; *Compression*, No. 12-1746, 2013 WL 2368039, at *5-6 (providing example of how someone in real life can perform the claimed "*information processing*" method despite requiring the manipulation of digital data). Section III above describes a real-life example of how the claimed steps would proceed in a charity golf tournament. That illustration shows that the claimed methods here can be "performed … by a human using a pen and paper." *Cybersource*, 654 F.3d at 1372.

### 1.     Preamble: performing abstract idea on general purpose computer is insufficient

| Claim language | Applicable case law and examples of similar claims invalidated by Courts |
|---|---|
| *[preamble] 1. A method of managing the operation of a game which includes a game environment, and is programmed to control a gaming action for at least one of a plurality of users, said managing method using a programmed computer to effect the following steps:* | General purpose computer cannot render patentable an abstract idea. *Dealertrack* ("*computer aided*"), *Bancorp* ("*performed by a computer*"), and *Fort Properties* ("*using a computer*"). |

The preamble recites that the method is "*using a programmed computer to effect the following steps.*" Courts have repeatedly been faced with applicants trying to avoid the ban on abstract ideas by adding a reference to a general purpose computer. However, courts routinely hold that computerizing a conventional method does not make the idea patentable.

The Federal Circuit held that the bare reference of "*computer aided*" in *Dealertrack*, "*performed by a computer*" in *Bancorp*, and "*using a computer*" in *Fort Properties* were insufficient to make abstract ideas patentable.

The courts in this District also have recently invalidated several abstract patents on

computerized methods.  *See Cardpool, Inc. v. Plastic Jungle, Inc.*, No. 12-4182, 2013 WL 245026 (N.D. Cal. Jan. 22, 2013) (computerized method of selling gift cards), *aff'd*, No. 2013-1227, 2014 WL 322026 (Fed. Cir. Jan. 30, 2014); *Compression*, No. 12-1746, 2013 WL 2368039 (computerized method of separating data into components); *OIP*, No. 12-1233, 2012 WL 3985118 (computerized method of selecting a product's price).  In *OIP*, this Court held that the claimed method of using a computer to select a product's price by offering potential prices and comparing buyers' responses was merely "steps describing what any business owner or economist does in calculating a demand curve for a given product": something "a merchant in a bazaar could have performed … centuries ago — and no doubt did."  No. 12-1233, 2012 WL 3985118, at *16.  In *Cardpool*, the patentee argued that the invention must be viewed as a whole and relied on implementing physical steps with a computer.  For example, instead of "a physical exchange of coin, a consumer could receive his rebate via electronic funds transfer from a vendor bank to a consumer bank" such that this "would be just one part of a computer-implemented system whereby the sale or exchange is processed electronically."  No. 12-4182, 2013 WL 245026, at *3.  The Court rejected that argument.  "It amounts to little more than the description of a complete transaction — what defendant accurately characterizes as a millennia old practice of an in-kind exchange of chattel — plus a computer."  *Id.*

Here, the bare reference to "*using a programmed computer*" in the '445 claims is no different. It is only a general purpose computer.

A "general purpose computer," a phrase frequently considered by courts in the §101 analysis, means a conventional computer programmed in an unspecified manner and with the basic components of a processing unit, storage unit, and display unit.  *See Accenture*, 728 F.3d at 1343. The recitation of such a "general purpose computer" does not inject any meaningful limitation to a claim that is otherwise directed to an abstract idea.  *Dealertrack*, 674 F.3d at 1333 ("Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render claim patent eligible."); *Bancorp*, 687 F.3d at 1278 (same).  *See also Prometheus*, 132 S.Ct. at 1301 (Reciting use on a "general purpose digital computer" does not differ significantly than just saying "apply it"; neither are patentable.); *Compression*, No. 12-1746, 2013 WL 2368039, at *8 ("General purpose computers programmed in an unspecified manner cannot satisfy" eligibility

Gibson, Dunn & Crutcher LLP

analysis.).

For example, in *Dealertrack*, the claim recited that the method was "*computer aided*." But, it did not specify "any level of involvement or detail" as to how the computer aids the method. 674 F.3d at 1334. The Court held that the claim "does not specify how the computer hardware and database are specially programmed to perform the steps claimed in the patent" and is "silent as to how a computer aids the method, the extent to which a computer aids the method, or the significance of a computer to the performance of the method." *Id.* at 1333. Without any specific restraints, the computer recited in the claim "can be programmed to perform very different tasks in very different ways" and thus provided no significantly meaningful limitation. *Id.* The Federal Circuit concluded that the undefined "*computer aided*" limitation was no less abstract than the underlying idea in the claims of a clearinghouse. *Id.*

Likewise, when analyzing similarly abstract methods implemented on a computer in the recent *en banc* Federal Circuit decision *CLS Bank*, Judge Lourie wrote:

> First, the requirement for computer implementation could scarcely be introduced with less specificity; the claim lacks any express language to define the computer's participation. In a claimed method comprising an abstract idea, generic computer automation of one or more steps evinces little human contribution.

717 F.3d at 1286.

Here, the claims recite no specific software or hardware, much less anything new or improved. Indeed, the claimed steps do not reference a computer at all. By instead using the preamble to describe a computer in the most generalized way possible ("*programmed computer*") with no details on how it performs the steps, the claims do exactly what the Supreme Court declared unpatentable: recite an abstract idea and say apply it on a computer. *See Prometheus*, 132 S.Ct. at 1294.

Because the claims lack any meaningful limitation relating to computer implementation, the claims preempt all known and unknown uses of the idea in the gaming industry. *See id.* at 1301. Essentially, the reference to a computer does nothing more than identify a technological field and attempt to monopolize use of the idea in that field.

2.     **Claimed steps: reciting conventional, obvious pre-solution activity is insufficient**

With no aid from the preamble, we next turn to the claimed steps to see if there is anything "significantly more" (some "innovative concept") other than the abstract idea.  The Supreme Court has established that adding "conventional or obvious pre-solution activity" to abstract concepts does not make those concepts patentable.  *Prometheus*, 132 S.Ct. at 1298.  Taking the form of inconsequential steps, structures, or applications, such pre-solution activity is any "well-understood, routine, conventional activity, previously engaged in by those in the field" as well as "steps that must be taken in order to apply" the abstract idea.  *Id.* at 1299-1300.  In particular, an abstract idea is not rendered patentable because of connections to the physical world.

In *Fort Properties*, the Federal Circuit explained that the method of managing a real estate portfolio with steps of buying and selling real estate was an abstract idea despite "physical activities involving the deeds, contracts, and real property."  671 F.3d at 1323.  It relied on the Supreme Court's holding in *Bilski*, which held the method of purchasing commodities by hedging risk was an abstract idea despite being "tied to the physical world through at least two tangible means: commodities and money."  *Id.* at 1322.  Similarly in *Cybersource*, the Federal Circuit held the method of validating credit card transactions was an abstract idea "even if some physical steps are required to obtain information from the database (e.g., entering a query via a keyboard, clicking a mouse)."  654 F.3d at 1372.

As in those recent cases, the abstract idea here is not rendered patentable based on generic references to physical items such as "*user*" (buyer) and "*game object*" (object purchased).  These items are always required when performing the abstract idea and thus cannot provide a meaningful limitation on the broad scope of the claim.  In *Bilski*, the claim was also directed to a method of managing purchases and included similar generic references to a "*consumer*" (buyer) and "*commodity*" (object purchased).  130 S.Ct. at 3223-24.  The Supreme Court had no difficulty in concluding, in a unanimous decision, that the claim was to an abstract idea, even though the method required initiating the exchange of commodities and money between the buyer and seller — real-world physical acts.  *Id.* at 3231.

Further, a claim-element-by-claim-element analysis of each step shows that there is nothing

more than "conventional or pre-solution activity" here. The initial steps (a) to (d) set the stage to perform the abstract idea, then the purchasing steps (e) to (g) break down the process into component steps in a fundamental way. No matter how subdivided the steps may be to increase the total, the end result leaves no meaningful limitation in any of the steps. *See Dealertrack*, 674 F.3d at 1333 (Though the claim sets forth 7 steps, the Court scrutinized the claim as "in its simplest form" only 3.).

| Claim language | Applicable case law and examples of similar claims invalidated by Courts |
|---|---|
| *a) tracking the activity of the at least one user in the course of the gaming action;* | Data-gathering steps do not confer patentability. *Cybersource* ("*obtaining information about other transactions*") and *CLS Bank* ("*obtaining from each exchange institution a start-of-day balance*"). |

Tracking a potential buyer's activity is inherent in identifying potential buyers, just like the claims in *Bilski* when finding interested buyers for the fixed rate. Data-gathering steps cannot confer patentability. *Cybersource*, 654 F.3d at 1370, 1372. This is true "even if some physical steps are required to obtain information from the database (e.g., entering a query via a keyboard, clicking a mouse)." *Id.* at 1372. Step (a) here is no different than the steps of "*obtaining information about other transactions*" in *Cybersource* and "*obtaining from each exchange institution a start-of-day balance*" in *CLS Bank* — both unsuccessful in patenting an abstract idea. 654 F.3d at 1370; 717 F.3d at 1285.

| Claim language | Applicable case law and examples of similar claims invalidated by Courts |
|---|---|
| *b) permitting the at least one user to create an account for receiving a consideration of the at least one user, the at least one user having a set of demographics;* | Permitting a buyer to create an account is an inherent step in allowing a buyer to make a purchase. *Bancorp* ("*generating a life insurance policy*") and *CLS Bank* ("*creating a shadow credit record and a shadow debit record*") |

Permitting a buyer to create an account also is an inherent setting-the-stage step in allowing a buyer to make a purchase, just like the claims in *Bilski* when initiating purchases. Step (b) here is no different than the steps of "*generating a life insurance policy*" in *Bancorp* and "*creating a shadow credit record and a shadow debit record for each stakeholder party*" in *CLS Bank* — both

unsuccessful in patenting an abstract idea. *See* 687 F.3d at 1271; 717 F.3d at 1285.

| Claim language | Applicable case law and examples of similar claims invalidated by Courts |
|---|---|
| c) *determining the eligibility of the at least one user to purchase at least one of a plurality of game objects, said eligibility determining comprises the following sub steps:*<br>    i) *permitting the at least one user to select the at least one game object,*<br>    ii) *setting the purchase price of the at least one game object, and*<br>    iii) *comparing the account balance of the at least one user's consideration with the set price of the at least one game object and, determining if the balance of the user's consideration is not less than the set price, determining the at least one user to be eligible to purchase the at least one game object;* | Number-crunching steps are insufficient to render an abstract idea patentable. *Cybersource* ("*verifying the validity of a credit card transaction over the Internet*" by "*obtaining information about other transactions,*" "*constructing a map of credit card numbers,*" and "*utilizing the map of credit card numbers to determine if the credit card transaction is valid*") and *Bancorp* (6 "*calculating*" and "*determining*" steps). |

Step (c) is a typical number-crunching step held by Courts to be insufficient to render an abstract idea patentable. "Methods which can be performed manually, or which are the equivalent of human mental work, are unpatentable abstract ideas." *Cybersource*, 654 F.3d at 1371; *Compression*, No. 12-1746, 2013 WL 2368039, at *5 ("[M]anipulations of digital data alone are not sufficient for a finding of patentability."). A person manually or mentally could receive information about a user's account balance ($20) and a price ($3) then compare the values to determine whether the balance is less than the price (20 > 3).

This is an even simpler number-crunching step than the ones in *Cybersource* and *Bancorp*. *Cybersource*'s method of "*verifying the validity of a credit card transaction over the Internet*" required the steps of "*obtaining information about other transactions that have utilized an Internet address that is identified,*" "*constructing a map of credit card numbers*" and "*utilizing the map of credit card numbers to determine if the credit card transaction is valid.*" 654 F.3d at 1370. The Federal Circuit held that a person could perform all these steps with "a pen and paper," even though there are physical steps to obtain the numbers via a keyboard or mouse. *Id.* at 1372. Similarly, *Bancorp* involved multiple calculating- and determining- steps, such as: "*calculating fee units,*" "*calculating surrender value protected investment credits,*" "*determining an investment value and a value of the underlying securities for the current day,*" and "*calculating a policy value and a policy*

*unit value for the current day.*"  687 F.3d at 1271.  The Federal Circuit concluded that — despite the length of the 8 claimed steps — "the determination of those values, and their subsequent manipulation, is a matter of mere mathematical computation" and thus "nothing remains in the claims but the abstract idea." *Id.* at 1280.

| Claim language | Applicable case law and examples of similar claims invalidated by Courts |
|---|---|
| d) displaying in the game environment a purchase price of the at least one game object; | Visual depiction of data is not sufficient, as every purchase must communicate (*i.e.* display) to the buyer a price. *Cybersource* ("*constructing a map*") and *Dealertrack* ("*forwarding funding decision data [to] display device*"). |

Visual depiction of data is not sufficient to meaningfully limit an abstract idea, as every purchasing transaction must communicate (*i.e.* display) to the buyer a price.  Showing the buyer the purchase price is inherent in offering the price to the buyer, just like the claims in *Bilski* when identifying a potential buyer for the fixed rate.  Step (d) here is just like the steps of "*constructing a map of credit card numbers*" in *Cybersource* or "*forwarding funding decision data from at least one of the remote funding source terminal devices to the remote application entry and display device*" in *Dealertrack* — both unsuccessful in patenting an abstract idea.  *See* 654 F.3d at 1370; 674 F.3d at 1331.  *See also OIP*, No. 12-1233, 2012 WL 3985118, at *2 ("*sending a first set of electronic messages over a network to devices*").

| Claim language | Applicable case law and examples of similar claims invalidated by Courts |
|---|---|
| e) presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the at least one gaming action of the at least one user and, the one game environment or the one set of demographics of the least one user | Offering object to buyer is conventional step in purchasing transaction.  *Bilski* ("*consumer purchased said commodity at a fixed rate*") and *Fort Properties* ("*transfer title to the first interest … to a buyer in exchange for money*") and *CLS Bank* (exchanging from credit record to debit record). |
| f) permitting the at least one user to purchase the at least one game object at the set purchase price without interrupting the gaming action of the at least one user; and | Allowing buyer to purchase object is conventional step in purchasing transaction.  *See same cites above.* |
| g) supplying the at least one purchased game object to the at least one user without interrupting the gaming action of | Supplying object to buyer is conventional step in purchasing |

Gibson, Dunn & Crutcher LLP

| *the at least one user and incorporating the game object into the game.* | transaction.  *See same cites above.* |

The purchasing steps in *Bilski* (providing a commodity to a consumer) are no different than the purchasing steps (e to g) here (providing a game object to a user).  The *Bilski* claims recite the step of "*initiating a series of transactions between said commodity provider and consumers of said commodity wherein said <u>consumers purchase said commodity</u> at a <u>fixed rate</u> based upon historical averages*."  130 S.Ct. at 3223-24.  The '445 claims merely divide that single step into its common-sense components: offering, accepting, and supplying.  That is the essence of step (e) "*presenting to the at least one user an <u>offer</u> to purchase the game object*," step (f) "*permitting the at least one user <u>to purchase</u> the at least one game object*," and step (g) "<u>*supplying*</u> *the at least one purchased game object to the at least one user without interrupting the gaming action*."  *See also Fort Properties*, 671 F.3d at 1318 and U.S. Patent No. 6,292,788 (steps of "*transferring a first interest in investment real estate having a first value and being subject to a first debt from an exchanger to a third party*" and "*using the third party to transfer title to the first interest in investment real estate to a buyer in exchange for money*"); *CLS Bank*, 717 F.3d at 1285 (step of exchanging from a party's credit record to a different party's debit record).  The Supreme Court in *Bilski* held that the claimed purchasing steps' addition of well-known techniques was insufficient; because the '445 claims are no different, they are also unpatentable.

Step (e) further recites that the offer is triggered by the players' activity in the game ("*tracked activity*" and "*the one game environment or the one set of demographics*").  Of course, all games are founded on basic gaming rules that permit players to access certain actions at certain times.  The game must control its inventory of resources and how players can access them.  Therefore, including criteria that the player must satisfy to receive an offer does nothing but recite an inherent concept of game play.  Similarly, in *Bilski*, the offer was triggered by consumers' activity in buying commodities at a certain rate corresponding to a certain risk position.  That requirement, inherent in the abstract idea of hedging risk, provided no protection against the rigorous demands of §101.  Nor does such an inherent concept to game play receive any different treatment here.

* * *

In sum, the '445 patent is invalid because cloaking an abstract idea in the guise of a computer environment and reciting well-known steps to perform the idea is insufficient to bring it within §101.

Dated:  March 7, 2014                    Respectfully submitted,

                                         GIBSON, DUNN & CRUTCHER LLP

                                         By:  /s/ Jason Lo
                                         Wayne Barsky
                                         Jason Lo
                                         Ellen Lin
                                         Jordan H. Bekier
                                         Cassandra L. Gaedt

                                         Attorneys for Defendant Zynga