John J. Edmonds (State Bar No. 274200)
jedmonds@cepiplaw.com
Stephen F. Schlather (admitted *pro hac vice*)
sschlather@cepiplaw.com
Shea N. Palavan (admitted *pro hac vice*)
spalavan@cepiplaw.com
COLLINS EDMONDS POGORZELSKI
SCHLATHER & TOWER, PLLC
1851 East First Street, Suite 900
Santa Ana, California 92705
Telephone: (951) 708-1237
Facsimile: (951) 824-7901

Attorneys for Plaintiff,
**GAMETEK LLC**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **GAMETEK LLC,** | |
| **Plaintiff,** | **Case No.: 3:13-cv-02546-RS** |
| **v.** | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT ZYNGA'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| **ZYNGA INC.,** | |
| **Defendant.** | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................... ii

TABLE OF AUTHORITIES ................................................................................. iv
  Cases ................................................................................**Error! Bookmark not defined.**

I.    INTRODUCTION ....................................................................................... 1

II.   THE '445 PATENT ..................................................................................... 1

III.  PROSECUTION HISTORY OF THE '445 PATENT ...................................... 6

IV.  DEFENDANT'S CHARACTERIZATIONS OF PRIOR ART ARE MISINFORMED .... 7

V.  LEGAL FRAMEWORK .............................................................................. 9

VI.  APPLYING THE SUPREME COURT'S AND FEDERAL CIRCUIT'S PRECEDENTS TO THE '445 PATENT, CLAIM 1 IS VALID ................................................. 13
  A.  CLAIM 1 OF THE '445 PATENT IS NOT DIRECTED TO AN ABSTRACT IDEA.... 13

  B.  CLAIM 1 COVERS AN APPLICATION OF WHAT DEFENDANT ARGUES IS AN ABSTRACT IDEA; CLAIM 1 DOES NOT CLAIM THE PURPORTED ABSTRACT IDEA ITSELF. ............................................................................................ 15

  C.  CLAIM 1 DOES NOT PREEMPT ALL APPLICATIONS OF AN ABSTRACT IDEA. 16

  D.  THERE ARE MEANINGFUL LIMITATIONS IN CLAIM 1. ........................................ 18

  E.  THE COURT CANNOT IGNORE THE CONCRETE, PALPABLE, TANGIBLE LIMITATIONS OF THE INVENTION THE PATENTEE ACTUALLY CLAIMS. .............. 19

  F.  INVENTIONS WITH SPECIFIC APPLICATIONS OR IMPROVEMENTS TO TECHNOLOGIES ARE LIKELY TO MEET THE PATENTABLE SUBJECT MATTER REQUIREMENT OF § 101. ......................................................................... 19

  G.  THE '445 PATENT MAKES GENUINE CONTRIBUTION TO THE SUBJECT MATTER. ................................................................................................. 20

  H.  THE ROLE OF A COMPUTER IN THE '445 PATENT SUPPORTS ITS PATENTABILITY. ..................................................................................... 20

  I.  CLAIM 1 OF THE '445 PATENT SATISFIES THE MACHINE OR TRANSFORMATION TEST, WHICH IS A USEFUL AND IMPORTANT INVESTIGATIVE TOOL IN A § 101 ANALYSIS. ................................................. 21

J.   CLAIM 1 SATISFIES BOTH THE MACHINE AND TRANSFORMATION PRONGS, ALTHOUGH ONLY ONE PRONG IS NECESSARY TO MEET THE TEST....................... 22

K.   NONE OF DEFENDANT'S CITED CASES IN WHICH CLAIMS WERE INVALIDATED INVOLVE CLAIMS, WHEN READ AS A WHOLE, MEANINGFULLY COMPARABLE TO THE '445 PATENT. ................................................................. 23

L.   DEFENDANT'S ALLEGATIONS OF MERE "CONVENTIONAL OR PRE-SOLUTION ACTIVITY" ARE BASELESS. .................................................................. 24

M.   DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE JUDGMENT ON THE PLEADINGS WOULD BE IMPROPER. .................................................................. 25

N.   THE OTHER CLAIMS OF THE '445 PATENT ARE ALSO VALID. ........................... 25

VII.   CONCLUSION............................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), L.L.C.,*
   687 F.3d 1266, 1278 (Fed.Cir.2012).................................................................... 21

*Bilski v. Kappos,*
   130 S.Ct. 3218, 177 L.Ed.2d 792 (2010)...................................... 9, 10, 15, 17, 21, 22

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.,*
   717 F.3d 1269 (Fed.Cir.2013)...................................... 11, 12, 14, 15, 17, 18, 20, 21

*Diamond v. Chakrabarty,*
   447 U.S. 303, 308, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980).................................... 9

*Diamond v. Diehr,*
   450 U.S. at 184, 101 S.Ct. 1048 (1981)........................................... 10, 15, 18, 24

*Gottschalk v. Benson,*
   409 U.S. 63, 93 S. Ct. 253, 34 L. Ed. 2d 273 (1972)........................................ 22

*Iconfind, Inc. v. Google, Inc.,*
   2:11-CV-0319-GEB-JFM, 2012 WL 158366, *3 (E.D. Cal. Jan. 18, 2012) ......................... 19

*In re Bilski,*
   545 F.3d 943, 952 (Fed. Cir. 2008)........................................................ 23

*In re Ferguson,*
   558 F.3d 1359, 1364 (Fed. Cir. 2009)...................................................... 22

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
   132 S. Ct. 1289 (2012).......................................................... 1, 10, 12, 15, 24

*Microsoft Corp. v. i4i Ltd. Partnership,*
   131 S.Ct. 2238 (2011)...................................................................... 15

*Nazomi Comm'cns, Inc. v. Samsung Telecomm'cns, Inc.,*
   2012 U.S. Dist. LEXIS 39468 (N.D. Cal. Mar. 21, 2012)................................... 9, 17

*Planet Bingo, LLC v. VKGS, LLC,*
   ——F.Supp.2d ——, 2013 WL 4427811 at *3 (W.D. Mich. 2013) ........................ 12

*Research Corp. Tech., Inc. v. Microsoft Corp.,*
   627 F.3d 859 (Fed. Cir. 2010).............................................. 1, 9, 14, 16

*SiRF Tech., Inc. v. Int'l Trade Comm'n,*
    601 F.3d 1319 (Fed.Cir.2010)........................................................................... 21, 22

*The Chamberlain Group, Inc. v. Lear Corp.,*
    756 F. Supp. 2d 938 (N.D. Ill. 2010) ................................................................. 18

*Ultramercial, Inc. v. Hulu,* LLC,
    722 F.3d 1335 (Fed. Cir. 2013)............................ 1, 9, 10, 12, 13, 14, 15, 16, 17, 18, 19, 24, 25

## I.   INTRODUCTION

"[I]t will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter. This is so because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338 (Fed. Cir. 2013) (citing *CLS Bank Int'l v. Alice Corp.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013)). There are three exceptions to the Patent Act's broad patent-eligibility principles: "laws of nature, physical phenomena, and abstract ideas." *Research Corp. Tech., Inc. v. Microsoft Corp.*, 627 F.3d 859, 867 (Fed. Cir. 2010). "[T]oo broad an interpretation of this exclusionary principle could eviscerate patent law. For all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). "[A]ny claim can be stripped down, simplified, generalized, or paraphrased to remove all of its concrete limitations, until at its core, something that could be characterized as an abstract idea is revealed. A court cannot go hunting for abstractions by ignoring the concrete, palpable, tangible limitations of the invention the patentee actually claims." *Ultramercial,* 722 F.3d at 1344. In this regard, Defendant's motion incorrectly assumes claim 1 is merely directed to an "abstract idea of allowing players to purchase additional objects during a game"– it is not.

## II.   THE '445 PATENT

Although the '445 specification discloses multiple things, the *claimed* invention pertains to novel video game embodiments comprising offers for game objects (for example, ammunition) being made based upon the tracked activity of the user, in-game purchases being made for real monetary consideration, and incorporating such objects into a game, all done in a real-time process

without the purchase interrupting the gaming action. The claimed invention comprises specific implementations of a programmed computer for managing video games in specific ways.

The '445 patent includes three independent claims (1, 15 and 17) from which other claims depend. Claim 1 is not limited to merely "the abstract idea of allowing players to purchase additional objects during a game" or "merely tak[ing] an age-old gaming concept of allowing players to purchase objects during a game" as Defendant alleges. Significantly more than such over-simplifications is present in the claim. Claim 1 claims a concrete, detailed and specific method of managing the operation of a video game which comprises:

> *a programmed computer* effecting the step of controlling a gaming action for at least one of a plurality of users;
>
> *a programmed computer* effecting the step of tracking the activity of a user in the course of the gaming action;
>
> *a programmed computer* effecting the step of permitting the user to create an account for receiving consideration;
>
> *a programmed computer* effecting the step of determining the eligibility of the user to purchase one of a plurality of game objects, said eligibility determining comprising the following sub steps:
>
> *a programmed computer* effecting the step of permitting the at least one user to select the at least one game object,
>
> *a programmed computer* effecting the step of comparing the account balance of the at least one user's consideration with the set price of the at least one game object
>
> *a programmed computer* effecting the step of determining if the balance of the user's consideration is not less than the set price,
>
> *a programmed computer* effecting the step of determining whether the user is eligible to purchase the game object;
>
> *a programmed computer* effecting the step of displaying in the game environment a purchase price of the at least one game object;
>
> *a programmed computer* effecting the step of presenting to the at least one user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the user;
>
> *a programmed computer* effecting the step of permitting the at least one user to purchase the at least one game object at the set purchase price without interrupting the gaming action of the at least one user; and
>
> *a programmed computer* effecting the step of supplying the at least one purchased game object to the at least one user without interrupting the gaming action of the at least one user and incorporating the game object into the game.

Ex. 1, '445 patent. Any "abstract idea" distilled from claim 1 is incomplete without including a programmed computer to effect the twelve foregoing concrete steps (*e.g.*, controlling…, tracking activity…, creating an account for storing consideration, determining eligibility comprising comparing an account balance…, presenting an offer to purchase a game object dependent upon a group of game parameters comprising the tracked activity of the user, effecting a purchase without interrupting gaming action, and supplying game objects without interrupting gaming action).

Claims 15 and 17 differ in certain respects from claim 1, including that neither comprises the programmed computer effecting the use of user demographic information, and both comprise the programmed computer effecting the presenting of offers to purchase game objects dependent upon a group of game parameters comprising at least the tracked activity of the user (as contrasted with claim 1 which comprises the programmed computer effecting the presenting of offers to purchase game objects dependent upon a group of parameters comprising user tracked activity, the game environment, or user demographics). Each claim expressly recites a machine – a programmed computer. This programmed computer performs twelve specific steps which are performable only by a programmed computer. What is claimed is far beyond a "bare reference to a general purpose computer" or a "basic purchasing transaction" as Defendant alleges.

Defendant's motion improperly focuses on broad unclaimed subject matter in the specification that does not require a programmed computer and that does not require the elements of the asserted claims. In described embodiments *actually covered* by the claims, the invention(s) of the '445 patent comprise a methods for transacting and integrating advantages in the form of integrated game objects to users of interactive gaming applications, wherein a participating user may obtain, in real time and upon payment of consideration, access to game objects for use and/or placement in the game. '445/2:63-67. Users have the ability to purchase game objects, for example

ammunition and resources, using various currency means. '445/3:1-13 & '445/5:15-17. The claimed purchase and supply process is "realized through a true two-way real time transaction system, allowing participating users to continue in their experience without the interruption of processing payment information." 3:55-58. This "real time" aspect ensures that the purchase and supply of the game object does not interrupt gaming action, thus enhancing game play and making in-game purchases easier and more desirable to conduct. The purchased game objects are integrated and incorporated into the electronic game. '445/3:4-8.

In accordance with, for example, the "demographic" or "tracked activity" limitations in the claims, the computing environment stores a profile of the user so that game objects may be offered in accordance with a user's profile. '445/3:58-60; '445. To effect a purchase transaction for a real-time, in game purchase of game objects the programmed computer checks the profile and account balance of the requesting participating user to see if he or she is qualified for the game object. '445/6:35-38. If the participating user qualifies, the user's account is debited and the requested game object is provided. '445/6:38-40. For example, a participating user navigating in a computing game environment requests more ammunition. '445/6:42-43. The user is processed (*e.g.*, checked for tracked activity and account information) and, if qualified, receives the ammunition immediately and without interrupting the gaming action. '445/6:43-45. This permits the participating user to continue in their computing game environment (*i.e.*, continue playing the game) without transaction processing interrupting the gaming action. '445/6:45-48.

FIG. 1 shows computing system 100 that may support the invention. '445/6:57-58. As described in the specification, computing system 100 comprises computer 20a that may comprise display device 20a' and interface and processing unit 20a". '445/6:58-60. Computer 20a may support computing application 180. '445/6:60-61. Computing application 180 may comprise

computing application processing and storage area 180 and computing application display 180b. '445/6:61-64. Game objects may be retrieved by computing application 180 from advantages data store 180a' of computing application processing and storage area 180a and shown to a user as display content 180b' on computing application display 180b. '445/7:3-8. Transacted advantages may be stored in advantages data store 180a' in user accounts. '445/7:9-12.

FIG. 1A is a system diagram of an exemplary computing network environment for implementing the invention. '445/4:17-19. FIG. 1B shows the cooperation of various computing elements when transacting game object advantages in a computing environment. '445/7:62-64. A participating user may employ computing application 180a operating on client computer 20a to send a request for game object advantages content 110 to content provider's server 10a over communications network 160. '445/7:64-8:2. In response, content provider's server 10a may process send the request and retrieve game objects from database 10b for communication to client computer 20a over communications network 160. '445/8:2-7.

FIG. 2 is a screen shot of an exemplary gaming computing application offering game object advantages to participating users. '445/4:23-24. As shown, the game object advantages system invention may be incorporated in computing application 180 displaying an interactive game through gaming pane 200. '445/8:20-23. Dialog box 210 may warn the user that he/she is low in ammunition in the interactive search and destroy game 205 that is being navigated. '445/8:27-29.

A user may choose to purchase additional ammunition. '445/8:29-31. Conventionally, gamers would be forced to use only skill to advance in the game. '445/8:33-34 & '445/8:36-38.

FIG. 4A shows a screen shot of an exemplary computing game application 413 describing exemplary integration and real-time transaction features. '445/9:14-16. Screen shot 415 comprises simulation content 420, advantages information 325, and transaction information 430. '445/9:16-

19. In operation, a participating user may operate computing simulation application 413 to interact with simulation content 420. '445/9:19-21. Computing simulation application 415 may be configured that is has access to advantages content provider computer server 10a (of FIG. 2) such that game object advantages may be offered through computing application 413 to the participating user while interacting with computing application 413. '445/9:21-26.

FIG. 5 describes the general processing performed in a preferred embodiment of the invention. '445/9:42-44. Processing begins at block 500 and proceeds to block 505 where a check is performed to determine if the participating user has an account to purchase advantages or transact interactive advertisements. '445/9:44-47. If the user has an account, he/she is prompted to login at block 510. '445/9:47-48. A determination of the advantages and/or desired products and services (as requested in the cyber realm) is made at block 520 to ascertain those advantages to offer to the user, or to provide to the user based on their request. '445/9:49-53. The advantages and/or products and services are supplied to the user at block 525. '445/9:53-55. Payment authorization is then made at block 530. '445/9:55-56. Using the present invention, participating users have the ability to "purchase" these environment features and/or elements, products, and services using various currency means. '445/9:56-64.

The various techniques described in the specification may be implemented in hardware or software, or a combination of both. '445/11:16-18 & '445/11:18-23.

## III.   PROSECUTION HISTORY OF THE '445 PATENT

The '445 patent underwent a lengthy prosecution history spanning almost six years, which involved seven (7) Office Actions, in which numerous iterations of the claims were rejected over prior art. Exhibit 2, FH174-183; FH197-205; FH234-241; FH307-314; FHFH339-346; FH367-378; FH432-441. After the original claims had been revised at least eight (8) times (FH111-121;

FH189-193; FH209-233; FH243-253; FH298-303; FH316-336; FH349-362; FH404-428), the closest prior art was arguably U.S. Patent No. 6,616,533 to Rashkovsky et al. After the seventh office action, the Applicant and Examiner had an interview (Ex. 2, FH168-171), wherein they discussed "suggested features that Examiner feels best characterizes system, including: By offering the [game object] feature in this manner back-end financial processing is avoided and the user has 'real-time' and instant access to the feature. While the user is playing the game is updated by adding the new feature and the user continues play with the new feature." *Id.* at FH171. Thereafter, the Applicant amended the claims, *Id.* at 111-122, and they were allowed. *Id.* at FH47-53. In a Notice of Allowability, the Examiner stated that the claimed invention was distinguished from prior art, including because the computerized system: "tracks a user's gaming actions, the system determines whether a user is eligible to purchase a game object based on the users account balance, the system presents an offer to the user to purchase the game object based on at least said tracked gaming action, the user purchases and is supplied with the game object without interrupting the gaming action, and the object is incorporated into the game." *Id.* at FH52. At one point during the prosecution, the Examiner rejected certain claims as being unpatentable under § 101. *Id.* at FH176-177. However, the Applicant overcame the rejection with claim amendments. *Id.* at FH119.

## IV.   DEFENDANT'S CHARACTERIZATIONS OF PRIOR ART ARE MISINFORMED

Defendant attempts to compare the claimed invention to carnival games, gambling, board games and golf are mistaken. None of the foregoing involves video games or the twelve steps recited in Section II above, including a programmed computer effecting the steps of controlling a gaming action, tracking user activity, determining eligibility to purchase a game object comprising comparing a purchase account balance with a purchase price, presenting an offer to purchase the game object dependent upon a group of game parameters comprising tracked activity, permitting

the user to purchase the game object using her account without interrupting the gaming action, supplying the purchased game object without interrupting the gaming action, and incorporating the game object into the game. For example, and without limitation, Defendant cannot identify any prior art carnival or gambling games that involve a computer managed game, determining eligibility to purchase a game object comprising comparing a purchase account balance with a purchase price, offers for game objects being made based upon demographics or tracked activity, purchases being made using an account without interrupting the gaming action, or incorporating a purchased game object into the game. Further, and also for example and without limitation, Defendant cannot identify any board games that involve a computer managed game, determining eligibility to purchase a game object comprising comparing a purchase account balance with a purchase price, offers for game objects being made based upon demographics or tracked activity, purchases being made with "currency means" such as real money or an in-game currency having a nexus with real money,[1] purchases of game objects being made using an account and without interrupting the gaming action, or incorporating a purchased game object into the game. In fact, traditional board games do not involve real purchases at all. Further, the '445 patent acknowledges inferior prior art in which game objects can be obtained through skilled game play rather than actual purchases. *See, e.g.* '445/8:29-34. Further, Defendants golf "mulligan" example does not involve a computer managed game, determining eligibility to purchase a game object comprising comparing a purchase account balance with a purchase price, offers for game objects being made based upon demographics or tracked activity, purchases of game objects being made using an account and without interrupting the gaming action, or incorporating a purchased game object into the game (*e.g.*, a "virtual good" incorporated into the game environment of a video game).

---

[1] *See* '445/3:11-18 ("Using the present invention, participating users have the ability to "purchase" these environment features or elements using various currency means, including ....")

## V.   LEGAL FRAMEWORK

Section 101 of the Patent Act defines the subject matter that is patentable as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101 ("§ 101"). § 101 lays out four subject matter categories of inventions or discoveries eligible for patent protection including "processes." The '445 patent claims methods which are properly characterized as processes.

Courts construe the § 101 definitions broadly. "In choosing such expansive terms ... modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). The Supreme Court has recognized, however, "three specific exceptions to [Section 101's] broad patent eligibility principles: laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010) ("*Bilski II*").

In determining whether a claim is directed to eligible patentable subject matter under § 101, the claims must be considered *as a whole* and read in light of the specification, with § 101 treated only as a "coarse eligibility filter," not the final arbiter of patentability. *Id*. at 3231; *Research Corp.*, 627 F.3d at 869.

Computer related inventions are worthy of patent protection. The Federal Circuit has explained the significance of such inventions: "…both this court and the Patent Office have long acknowledged that 'improvements thereof' through interchangeable software or hardware enhancements deserve patent protection. Far from abstract, advances in computer technology— both hardware and software—drive innovation in every area of scientific and technical endeavor." *Ultramercial, supra,* at *43-44. *See Nazomi Comm'cns, Inc. v. Samsung Telecomm'cns, Inc.*, 2012 U.S. Dist. LEXIS 39468, at *10 (N.D. Cal. Mar. 21, 2012). With respect to computer related

inventions, "while the mere reference to a general purpose computer will not save a method claim from being deemed too abstract to be patent eligible, the fact that a claim is limited by a tie to a computer is an important indication of patent eligibility." *Ultramercial, supra*, at *34 (citing *Bilski II*, 130 S. Ct. at 3227). This tie to a machine moves it farther away from the abstract idea itself, and makes it less likely that the claims will pre-empt all practical applications of the idea. *Id.*

In *Diehr*, the Court noted that "in a process claim ... a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Diamond v. Diehr*, 450 U.S. at 184, 188, 101 S.Ct. 1048 (1981). Further, in "determining the eligibility of [a] claimed process for patent protection under § 101, claims must be considered as a whole" to determine whether their applications to a particular context provides material of additional value beyond the abstract idea itself. *Id.*

Courts have had difficulty defining with precision the line between an impermissibly abstract idea and a patentable process. The two most recent Supreme Court decisions on the subject are *Bilski II* and *Mayo. Mayo,* 132 S.Ct. at 1298-99. In *Bilski II*, the Supreme Court provided lower courts with some guidance in drawing the line. Relying on precedents set in the *Benson* and *Flook* cases, the Court held that "[t]he concept of hedging...is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook*." *Bilski II*, 130 S. Ct. at 3231. The Court also grounded its reasoning in concern about preemption, since "[a]llowing petitioners to patent risk hedging would preempt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id*. at 3231. In contrast to *Bilski II,* the '445 claims neither preempt use of an approach in all fields (or for that matter in the field of gaming), nor do they effectively grant a monopoly over an abstract idea.

After *Bilski II*, the Federal Circuit worked to provide further definition to the test for determining process patent eligibility under Section 101. In May 2013, the Federal Circuit attempted, unsuccessfully, to provide definitive guidance in *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed.Cir.2013). The patent holder in *CLS Bank* claimed a computerized method of hedging risk in a two party deal by enlisting a mutually trusted third party to ensure that each party complies with its payment obligation during the period between the making of the deal and the actual closing. The district court held the patents claimed abstract ideas. The Federal Circuit issued a *per curium* opinion, wherein a majority of the court affirmed the invalidation of the method patents on the ground that they claimed an abstract idea while dividing 5–5 on patentability of the system claims. *Id*. at 1273.

Judge Lourie, joined by four members of the panel, advanced a test for evaluating abstractness under 35 U.S.C. § 101, which he called an "Integrated Approach." First, the court must determine whether the claimed invention fits within one of the four broad statutory classes set forth in 35 U.S.C § 101: "any new and useful process, machine, manufacture, or composition of matter," or an improvement thereof. *See Id*. at 1282 (Lourie, J., concurring). Assuming that this condition is met, the court next must determine whether one of the judicial exceptions to subject matter eligibility-a law of nature, natural phenomenon or an abstract idea-nonetheless bars the claim. *Id.* With regard to this second step Judge Lourie stated: "A preliminary question in applying the exceptions to such claims is … Does the claim pose any risk of preempting an abstract idea?" *Id.* To address this issue, Judge Lourie cautioned that "it is important at the outset to identify and define whatever fundamental concept appears wrapped up in the claim so that the subsequent analytical steps can proceed on a consistent footing." *Id.*

Once the pertinent abstract idea has been identified, under Judge Lourie's Integrated Approach, the court next evaluates the balance of the claim "to determine whether it contains additional substantive limitations that narrow, confine, or otherwise tie down the claim so that, in practical terms, it does not cover the full abstract idea itself." *Id.* at 1282. Judge Lourie explains that "[t]he requirement for substantive claim limitations beyond the mere recitation of a disembodied fundamental concept has 'sometimes' been referred to as an 'inventive concept,'" *Id.* (*citing Mayo*), and "in the § 101 context refers to a genuine human contribution to the claimed subject matter" or "a product of human ingenuity," *Id.* at 1283. Further, the human contribution must be more than "a trivial appendix to the underlying abstract idea," "token or trivial limitations," or "vague limitations cast in highly general language." *Id.*

Chief Judge Rader, joined by three members of the *en banc* panel, articulated a different approach. *Id.* at 1299–1302. One court has referred to Judge Rader's approach as the "Meaningful Limitations Approach." *See Planet Bingo, LLC v. VKGS, LLC*, ——F.Supp.2d ——, 2013 WL 4427811, at *3 (W.D. Mich. 2013). Under this approach, the court first must determine whether the claim involves an intangible abstract idea. *CLS Bank*, 717 F.3d at 1297. This fact alone, however, will not disqualify the patent. Rather, the court must then engage in the second step of the inquiry: "whether a claim includes meaningful limitations restricting it to an application, rather than merely an abstract idea." *Id.* at 1299. Although Chief Judge Rader and Judge Lourie propose different approaches, both agreed that the method and computer-readable media claims at issue in *CLS Bank* were patent-ineligible because they were directed to a patent-ineligible abstract idea— the concept of escrow. *Id.* at 1285–89; *Id*. at 1311–1313.

The *CLS Bank* case was followed by *Ultramercial,* 722 F.3d at 1335. In *Ultramercial,* Judges Rader and Lourie came to the same conclusion – *i.e.*, that the patent at issue for a particular

internet and computer-based method for monetizing copyrighted products was not manifestly abstract so as to be ineligible for patent protection -- based upon their differing approaches. *Id.* at *14–*17; *Id.* at *17–*18 (Lourie, J., concurring).  At least for the similar reasons that the claims in *Ultramercial* were found to be patentable, the '445 claims are also patentable.

At issue in *Ultramercial* was a patent claiming "a method for monetizing and distributing copyrighted products over the Internet." *Id.* at *14. Chief Judge Rader wrote the opinion for the court and Judge Lourie wrote a concurring opinion, wherein they agreed that the asserted claims were eligible for patent protection. *Id.* at *14–*17; *Id.* at *17–*18 (Lourie, J., concurring). Chief Judge Rader noted that: "A claim can embrace an abstract idea and be patentable.... Instead, a claim is not patentable only if, instead of claiming an application of an abstract idea, the claim is instead to the abstract idea itself. The inquiry here is to determine on which side of the line the claim falls: does the claim cover only an abstract idea, or instead does the claim cover an application of an abstract idea?" *Id.* at *7.

## VI.   APPLYING THE SUPREME COURT'S AND FEDERAL CIRCUIT'S PRECEDENTS TO THE '445 PATENT, CLAIM 1 IS VALID

## A.  CLAIM 1 OF THE '445 PATENT IS NOT DIRECTED TO AN ABSTRACT IDEA.

Claim 1 is not directed to an abstract idea. Defendants' motion should be denied for this reason alone, especially in light of the applicable standards. To grant Defendant's motion, "the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." *Id.* at 1339. However, the only plausible reading of claim 1 is that it is not directed to an abstract idea (the same applies for claims 15 and 17 as well). There is no basis for holding that the only plausible reading of claim 1 is that it is directed to an abstract idea or that Defendant has proved by clear and convincing evidence that the abstract idea exception applies. Defendant simply assumes that "the '445 patent represents an "abstract idea of allowing players to purchase

additional objects during a game." Defendant does not explain how it reached this conclusion. Nevertheless, Defendant's conclusion is incorrect. Relying on its unsupported assumption, the motion concludes that the patent would "preempt all known and unknown uses of the idea in the gaming industry." Defendant improperly ignores the "limitations of the invention the patentee actually claims." *See Id*. at 1344. Defendant fails to even analyze the "preliminary question" that must be answered before undertaking a § 101 analysis – whether the claim at issue raises abstractness concerns at all and poses a risk of preempting an abstract idea. *See CLS Bank*, 717 F.3d at 1282.

Claim 1 (as well as claims 15 and 17) claims a concrete and specific method of managing the operation of a game which comprises a programmed computer effecting the twelve steps recited in Section II above.  Rather than arguing in any meaningful fashion that claim 1 (or any other claim) as a whole is invalid, Defendant first erroneously summarizes an invention of the '445 patent and then improperly divides claim 1 into parts and analyzes each part separately. *Ultramercial*, 722 F.3d at 1344. In so doing, Defendant ignores and/or downplays that a programmed computer takes concrete steps in a specific and concrete fashion.

Claim 1 is not directed to an abstract idea. The method of claim 1 could not be performed entirely in a human's mind or without a computer implementing it. *See Research Corp.,* 627 F.3d at 869. Defendant's allegation that the claimed method "can be practiced without any computer implementation" is baseless. A human cannot, among other things, effect the steps of controlling the action in a video game; displaying in a game environment a purchase price of a game object; presenting to a user a user an offer to purchase the game object dependent upon a group of game parameters comprising the tracked activity of the user; permitting a user to purchase a game object

in real time without interrupting the gaming action; supplying a purchased game object in real time without interrupting the gaming action; or incorporating the game object into the game.

Defendant fails at any meaningful explanation of how the preliminary question of a § 101 analysis is answered affirmatively. Abstractness "should exhibit itself so manifestly as to override the broad statutory categories of eligible subject matter and the statutory context that directs primary attention on the patentability criteria of the rest of the Patent Act." *Research Corp*, 627 F.3d at 868. Defendant cannot prove by clear and convincing evidence that claim 1 is directed to an abstract idea.

The fact that the PTO granted the '445 patent provides a presumption that the claims cover patentable subject matter. *CLS Bank*, 717 F.3d at 1284; *see also Ultramercial*, 722 F.3d at 1342. To overcome this presumption requires clear and convincing evidence. *Microsoft Corp. v. i4i Ltd. Partnership*, 131 S.Ct. 2238, 2239 (2011). In order for Defendant to prevail, "the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility." *Ultramercial*, 722 F.3d at 1339. Accordingly, "dismissal for lack of eligible subject matter will be the exception." *Id*.

**B. CLAIM 1 COVERS AN APPLICATION OF WHAT DEFENDANT ARGUES IS AN ABSTRACT IDEA; CLAIM 1 DOES NOT CLAIM THE PURPORTED ABSTRACT IDEA ITSELF.**

Assuming *arguendo* claim 1 is directed to an abstract idea that raises § 101 concerns, it covers a specific application of the purported abstract idea "A claim can embrace an abstract idea and be patentable." *Mayo*, 132 S.Ct. at 1294. To be patent eligible the claim must claim an application of an abstract idea, rather than the abstract idea itself. *Id.; Bilski II*, 130 S. Ct. at 3230; *Diamond v. Diehr*, 450 U.S. at 188. A court must focus on the entirety of a claim when determining if it covers an abstract idea or an application of an abstract idea. *Ultramercial*, 722 F.3d at 1344.

A court cannot ignore the limitations of the invention. *Id.* Inventions with, as we have here, specific applications or improvements to technologies are likely to meet the requirements of § 101. *Research Corp.*, 627 F.3d at 869. If the Court agrees with Defendant that claim 1 is directed to an abstract idea, this Court should find that it claims an application of the abstract idea – not the abstract idea itself.

## C.  CLAIM 1 DOES NOT PREEMPT ALL APPLICATIONS OF AN ABSTRACT IDEA.

A thread in the Supreme Court's 101 jurisprudence is concern that a patented process will preempt all applications of an abstract idea. "[A]ny inquiry into the scope of preemption – how much of the field is "tied up" by the claim – by definition will involve historic facts: identifying the 'field,' the available alternatives, and the preemptive impact of the claims in that field. The presence of factual issues coupled with the requirement for clear and convincing evidence normally will render dismissal under Rule 12(b)(6) improper." *Id.* For example, claim 1 is directed to specific method for a programmed computer to manage a game. '445 patent, claim 1. Clearly, this does not preempt the entire field of gaming or in-game purchasing, which would include – for example: (1) offering to sell game objects not being dependent upon the user's demographics or tracked activity in the game; (2) purchasing of game objects that interrupt the user's gaming action; (3) interrupting the user's gaming action to supply purchased game objects; or (4) incorporating game object into games (sometimes referred to as "virtual goods").

Notwithstanding that Defendant's arguments involve issues of fact, claim 1 is sufficiently limited to an actual application of the invention claimed and does not somehow preempt the entire field of impairment detection. Contrary to Defendant's position, just because there is a wide breadth of applications for claim 1 does not mean it is abstract. *See Ultramercial*, 722 F.3d at 1353

("breadth and lack of specificity does not render the claimed subject matter impermissibly abstract"); *see also CLS Bank*, 717 F.3d at 1281.

Thus when faced with an accused patent infringer's argument that the asserted claims are ineligible for constituting abstract ideas, courts focus on whether the claims effectively preempt other parties from use of an abstract idea or instead include additional steps to transform the abstract into an inventive application. *Bilski II*, 130 S. Ct. at 3231; *see also Ultramercial, supra*, at *36 ("with a claim tied to a computer in a specific way, such that the computer plays a meaningful role in the performance of the claimed invention, it is as a matter of fact not likely to pre-empt virtually all uses of an underlying abstract idea, leaving the invention patent eligible"); *Nazomi*, *supra*, at *15 (denying motion for summary judgment of invalidity under § 101 in part where movant failed to "clearly identify the abstract idea the [] patent claims allegedly preempt").

Here, the claims are specifically directed to methods which use a programmed computer to effect twelve specific, concrete steps. Thus, the claims do not wholly preempt third parties from, *inter alia*, use of a computer for gaming, or for that matter, the claims do not preempt allowing players to purchase additional objects during a game. Rather, all that are preempted are those who literally or equivalently practice elements of the novel patent claims. *Ultramercial, supra*, at *36. This therefore is not like the claims in *Bilski II*, which would have allowed the patentee to patent risk-hedging in general. *Bilski II,* 130 S. Ct. at 3231. Instead, the claims only foreclose others from, *inter alia*, use of the computer method and system as claimed and disclosed in the patent to perform the steps in the manner set forth therein. *Ultramercial, supra*, at *38, 41 (finding that claims, which were directed to a specific application of a method implemented by several computer systems, did "not simply claim the age-old idea that advertising can serve as currency and did not "risk…preempting all forms of advertising, let alone advertising on the Internet"); *Diehr*, 450 U.S.

at 187 (claims patent eligible since they "only foreclose[d] from others the use of [disclosed] equation in conjunction with all of the other steps in the[] claimed process"). Given that the claims do not effectively grant a monopoly over an abstract idea or the exclusive right to every improvement in the field of computerized Bingo, the claims of the patent are not so manifestly abstract as to be patent ineligible. *Ultramercial, supra* at *46; *The Chamberlain Group, Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 969 (N.D. Ill. 2010) (noting, in the § 101 analysis, that the "claims do not purport, in any way, to preclude the use of the mathematical algorithms that operated within the transmitter for other purposes").

**D.  THERE ARE MEANINGFUL LIMITATIONS IN CLAIM 1.**

A second common thread in the above cases invalidating patent claims for abstractness is that the patents lacked sufficient limitations to direct the claim to a particular area. This well-established notion is embodied in Judge Rader's proposed test in *CLS Bank* that a claim must have "meaningful limitations restricting it to an application, rather than merely an abstract idea." *CLS Bank*, 717 F.3d at 1299. Here, there are meaningful limitations found in the twelve steps present in claim 1 (and comparably in claims 15 and 17).

The court must focus on the entirety of a claim. *Diehr*, 450 U.S. at 188 ("In determining eligibility…under § 101, their claims must be considered as a whole…[t]his is particularly true in a process claim because a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made."). Defendant's approach of individually analyzing certain limitations of claim 1 is improper and contrary to Federal Circuit precedent. *See Id.; Ultramercial*, 722 F.3d at 1344. "The relevant inquiry is whether a claim, as a whole, includes meaningful limitations restricting it to an application, rather than merely an abstract idea." *Id*.

Defendant improperly attempts to strip down claim 1 to a purported abstract idea without even analyzing all limitations, much less viewing the claim as a whole. Additionally, there are no "token pre- or post-solution steps" because each limitation in claim 1 is essential to the invention claimed. Accordingly, Defendant's motion should be denied. *See Iconfind, Inc. v. Google, Inc.*, 2:11-CV-0319-GEB-JFM, 2012 WL 158366, at *3 (E.D. Cal. Jan. 18, 2012). In *Iconfind*, Google attempted to distill the claims to "constituent parts" and "substantive steps," but the court held that "Google has not shown under the applicable 'clearly established' standard of Rule 12(c) that the concepts embodied in the '459 Patents are 'so manifestly abstract as to override the statutory language of Section 101.'" *Id.* (*citing Ultramercial*, 657 F.3d at 1330).

**E. THE COURT CANNOT IGNORE THE CONCRETE, PALPABLE, TANGIBLE LIMITATIONS OF THE INVENTION THE PATENTEE ACTUALLY CLAIMS.**

Whether or not claim 1 is directed to an abstract idea must be determined by the claim, not the perceived "basic idea" at the "core" of the invention. *Ultramercial*, 722 F.3d at 1344. Defendant's attempts to persuade this Court to focus only on the purported abstract idea of the '445 patent stands in stark contrast to Federal Circuit precedent. *Id.* A court cannot ignore the "concrete, palpable, tangible limitations of the invention the patentee actually claims." *Id.* The twelve claim elements noted in Section II above, individually and collectively, provide an "inventive concept" comprising palpable limitations which represents "significantly more" than any such abstract idea. They are not "routine" or "conventional" activities, as illustrated in Sections II and III above.

**F. INVENTIONS WITH SPECIFIC APPLICATIONS OR IMPROVEMENTS TO TECHNOLOGIES ARE LIKELY TO MEET THE PATENTABLE SUBJECT MATTER REQUIREMENT OF § 101.**

"[I]nventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act." *Research Corp.*, 627 F.3d at 869. In *Research Corp.*, the Federal Circuit found

that the invention presented "functional and palpable applications in the field of computer technology" and held the claim met the requirement for patent eligible subject matter. *Id.* at 868-69. Similarly, this Court should find that claim 1 claims a "functional and palpable application" and covers patent eligible subject matter. The '445 patent generally claims an improvement to video games wherein the twelve concrete steps set forth in Section II above, individually and collectively distinguish the invention over the prior art. For example, as noted in the discussion of prosecution history above, a game comprising actually purchasing game objects for incorporation into the game without interrupting the gaming action was absent from the prior art. More recently, "in game" and "in app" real-time purchases of "virtual goods" without interrupting gaming action have become very popular, thus validating the forethought of the'445 inventor Mr. Cartwright.

## G. THE '445 PATENT MAKES GENUINE CONTRIBUTION TO THE SUBJECT MATTER.

Claim 1 of the '445 patent would also pass Judge Laurie's proposed test in *CLS Bank*, which requires an "inventive idea" constituting a "genuine human contribution" to the subject matter, such that the claim moves outside of the realm of abstract ideas and into the category of particularized inventions. 717 F.3d at 1283. This is evidenced by the almost six years of prosecution in which the inventor Mr. Cartwright amended the claims eight times to overcome voluminous prior art cited in seven different office actions. For example, in the Notice of Allowability, the Examiner stated that the claimed invention was distinguished from prior art, including for the reasons noted in Section II above. Ex. 2 at FH52. The inventive ideas here comprise the twelve steps note in Section II above. As also noted above, the recent astounding popularity of "in game" and "in app" real-time purchases of "virtual goods" without interrupting gaming action goes toward validating the contribution and forethought of the'445 inventor.

## H. THE ROLE OF A COMPUTER IN THE '445 PATENT SUPPORTS ITS PATENTABILITY.

The Federal Circuit's most recent test for determining the relevance of a computer element of a claim in the Section 101 analysis is arguably context specific. "To salvage an otherwise patent ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not." *Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), L.L.C.*, 687 F.3d 1266 (Fed.Cir.2012); *accord SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed.Cir.2010). The processes noted in Section II above cannot be, and never were, performed by a human absent a computer. The computer element of the claim does not "function solely as an obvious mechanism for permitting [the claimed elements] to be achieved more quickly." *Id.*

A different test for the relevance of a computer to an otherwise abstract idea claim was set forth by Judge Rader in his opinion in *CLS Bank*. Judge Rader posited that: "The key to this inquiry is whether the claims tie the otherwise abstract idea to a specific way of doing something with a computer, or a specific computer for doing something; if so, they likely will be patent eligible, unlike claims directed to nothing more than the idea of doing that thing on a computer." *CLS Bank*, 717 F.3d at 1302. Under this test as well, patent eligibility is met, because the twelve steps noted in Section II involve, at a minimum, a specific way of doing something with a computer.

## I.   CLAIM 1 OF THE '445 PATENT SATISFIES THE MACHINE OR TRANSFORMATION TEST, WHICH IS A USEFUL AND IMPORTANT INVESTIGATIVE TOOL IN A § 101 ANALYSIS.

As part of the holistic analysis required by *Bilski II*, the "machine or transformation" test serves as a useful non-dispositive "investigative tool." *Bilski II*, 130 S.Ct. at 3227. The "machine or transformation test" further proves claim 1 covers patent eligible subject matter. At the very least, it demonstrates that Defendant's motion should be denied, because Defendant cannot meet their burden by clear and convincing evidence – particularly at this early stage. The machine or transformation test asks if a claimed process is (1) tied to a particular machine or apparatus, or (2)

it transforms a particular article into a different state or thing. *Id.* at 3225-26. Further, "the use of a specific machine or transformation of an article must impose meaningful limits on the claim's scope…." *Id*. If the machine prong is met, the court need not analyze the transformation prong. While the Supreme Court has held that this test is not the sole test for determining patent eligibility, it is a "useful and important clue, an investigative tool." *Id.* at 3227. The Federal Circuit has stated that a machine "includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result." *In re Ferguson*, 558 F.3d 1359 (Fed. Cir. 2009).

Claim 1 satisfies the test, because it is tied to a particular machine or apparatus; here, the programmed computer that performs the twelve steps set forth in Section II. Therefore, claim 1 passes the test – indicating to the Court that Defendant's motion must be denied. *See SiRF*, 601 F.3d at 1332-33. In *SiRF*, the Federal Circuit found that the claims were properly directed to patentable subject matter, because they explicitly required the use of a GPS receiver and could not be performed without its use. *SiRF*, 601 F.3d at 1333. Further, the invention claimed by claim 1 cannot be performed without a machine. Claim 1 requires the use of the "programmed computer" and cannot be practiced without it. Contrary to Defendant's arguments that the use of a computer is merely a "post-solution" limitation, the "programmed computer" is a central and necessary feature of claim 1**.**

## J.   CLAIM 1 SATISFIES BOTH THE MACHINE AND TRANSFORMATION PRONGS, ALTHOUGH ONLY ONE PRONG IS NECESSARY TO MEET THE TEST.

If a process is not tied to a particular machine then the "machine or transformation" test next asks whether the process produces a "transformation and reduction of an article to a different state or thing." *Gottschalk v. Benson*, 409 U.S. 63, 70, 93 S. Ct. 253, 34 L. Ed. 2d 273 (1972). Later, a doctrine emerged allowing the transformation test to apply to manipulations of

nonphysical data. The Federal Circuit explained that: The raw materials of many information-age processes ... are electronic signals and electronically manipulated data ... [raising the question of] [w]hich, if any, of these processes qualify as a transformation or reduction of an article into a different state or thing constituting patent eligible subject matter?" *In re Bilski*, 545 F.3d 943, 952 (Fed. Cir. 2008) (en banc). In *Bilski I*, the Federal Circuit held that the data manipulated must transform either a "physical object or substance, or an electronic signal representative of any physical object or substance." *Id*. at 964.

Claim 1 meets the transformation prong as the computer associated with the game is transformed into a different logical state. The process of claim 1 transforms a programmed computer managing a video game from a logic state wherein, without limitation, activity is tracked, a purchase account is created, a game object is purchased, and a game object is incorporated into the game. The game object, *e.g*., "virtual good," is representative of a physical object or substance, and thus meets the test set forth in *Bilski I.*

## K. NONE OF DEFENDANT'S CITED CASES IN WHICH CLAIMS WERE INVALIDATED INVOLVE CLAIMS, WHEN READ AS A WHOLE, MEANINGFULLY COMPARABLE TO THE '445 PATENT.

Defendants cite multiple cases in which the claims were deemed too abstract. None of these cases are meaningfully comparable to the '445 patent claims. The twelve claim elements noted in Section II above, individually and collectively, provide an "inventive concept" comprising palpable limitations which represents "significantly more" than any alleged abstract idea. They are not "routine" or "conventional" activities, as illustrated in Section III above when contrasting the claimed invention with carnival games, gambling, board games and golf. Unlike the claims in cases cited by Defendants, the '445 claims are not "silent as to how a computer aids the method, nor do they lack "express language to define the computer's participation" as Defendant alleges. To the contrary, the computer aids the method in twelve concrete steps, all embodied in the express

language noted in Section II above. The express language in the claims (see steps set forth in Section II above) contradicts Defendant's allegation that they merely "recite an abstract idea and say apply it on a computer."

## L. DEFENDANT'S ALLEGATIONS OF MERE "CONVENTIONAL OR PRE-SOLUTION ACTIVITY" ARE BASELESS.

In *Mayo*, the Supreme Court recognized that, if to implement the abstract concept, one must merely perform a step that is a routine and conventional aspect of the abstract idea, then the step merely separately restates an element of the abstract idea, and thus does not further limit the abstract concept to a practical application. *See Mayo*, 132 S.Ct. at 1298*; Ultramercial*, 722 F.3d. at 1347. However, if the added limitations do more than recite pre- or post-solution activity, they are central to the solution itself; and, in such circumstances, the abstract idea is not wholly pre-empted; it is only preempted when practiced in conjunction with the other necessary elements of the claimed invention. *See Diehr*, 450 U.S. at 187, 101 S.Ct. 1048 ("[T]he respondents here … do not seek to pre-empt the use of that equation. Rather, they seek only to foreclose from others the use of that equation in conjunction with all of the other steps in their claimed process."); *Ultramercial*, 722 F.3d. at 1347. None of the claim limitations viewed by Defendants in isolation constitute "conventional or pre-solution activity," or for that matter, any routine, inherent or conventional aspect of any abstract idea. For example, this is evidenced by the almost six years of prosecution in which the inventor Mr. Cartwright amended the claims eight times to overcome voluminous prior art cited in seven different office actions. The unconventional and non-routine steps here comprise the twelve steps note in Section II above, including those specifically noted by the Examiner as being novel over prior art video games, including but not limited to purchasing game objects using consideration stored in an account with the transaction taking place in real time without interrupting the gaming action, with the game object being integrated into the game.

**M. DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE JUDGMENT ON THE PLEADINGS WOULD BE IMPROPER.**

"The analysis under § 101, while ultimately a legal determination, is rife with underlying factual issues." *Id.* at 1339. Indeed, "factual issues may underlie determining whether the patent embraces a scientific principle or abstract idea." *Id.* Many factual disputes exist even if the Court determines it is possible to know the precise scope of claim 1 without undertaking claim construction. Factual issues include "determining whether the patent embraces a scientific principle or abstract idea." *Id.* "[A]nalyzing whether something was 'conventional' or 'routine' involves analyzing facts." *Id.* Inquiry into the scope of preemption involves factual issues. *Id.* The parties dispute that claim 1 is directed to an abstract idea and, if it is, the parties dispute how to characterize or define the idea. Assuming it is directed to an abstract idea, claim 1 does not present any risk of preempting the entire field of game purchases.

**N.  THE OTHER CLAIMS OF THE '445 PATENT ARE ALSO VALID.**

Defendant's motion does not meaningfully address any claims except claim 1. As noted above, independent claims 15 and 17 differ in material respects from claim 1. As such, irrespective of the merits of Defendant's meritless attack on claim 1, Defendant's requested relief, *i.e.*, the dismissal of this case, is unsupported and wholly inadequately briefed.

**VII.    CONCLUSION.**

For the foregoing reasons, Plaintiff GT Gaming (f/k/a Gametek LLC) respectfully requests that Defendant's motion be denied.

March 21, 2014                                   Respectfully Submitted,

                                                */s/ John J. Edmonds*
                                                John J. Edmonds

                                                Attorney for Plaintiff,
                                                **GT GAMING LLC**